666 A.2d 1314

**Arlena BEEMAN**

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

**No. 188, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 7, 1995.

Ada E. Cherry–Mahoi, Baltimore (Andrew S. Penn, Landover, and Carolyn Lathrop, Cumberland, on the brief), for appellant.

David R. Morgan, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before FISCHER, DAVIS and HARRELL, JJ.

HARRELL, Judge.

Appellant, Arlena Beeman, appeals from a judgment of the Circuit Court for Allegany County (Sharer, J.) that affirmed the order of an administrative law judge dismissing her appeal from the decision by a clinical review panel to administer certain antipsychotic medications to her forcibly. In this appeal, we consider whether § 10–708(k) of the Health–General Article of the Annotated Code of Maryland comports with the requirements for due process contained in the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights. The statutory provision, on its face, imposes a forty-eight hour window in which to appeal to an administrative law judge decisions made by clinical review panels to forcibly medicate psychiatric patients.

The statute does not expressly take into account the patient's mental capacity to understand and exercise that right of appeal. Because we believe that the existing procedural protections contained in the statute as a whole, in light of the presumption of competency and the availability of alternative guardianship proceedings, adequately protect the patient's constitutional liberty interests, we shall affirm.

## ISSUES PRESENTED

Appellant presents two issues for our consideration, which we have slightly re-phrased for analysis as follows:

I. Does the failure by the Department of Health and Mental Hygiene to assess and account for an involuntarily committed psychiatric patient's mental capacity to understand and exercise her right to an administrative appeal from a decision by a clinical review panel to forcibly medicate her violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution or Article 24 of the Maryland Declaration of Rights?

II. Does the failure by the Department of Health and Mental Hygiene to assess and account for an involuntarily committed psychiatric patient's mental capacity to understand and exercise her right to an administrative appeal from a decision by a clinical review panel to forcibly medicate her violate the anti-discrimination prohibitions and reasonable accommodation obligations of the Americans with Disabilities Act and/or Section 504 of the Vocational Rehabilitation Act of 1973?

## FACTS AND PROCEEDINGS BELOW

On 23 July 1993, appellant was involuntarily retained at the Thomas B. Finan Center ("Finan Center"), a psychiatric institution operated by the Maryland State Department of Health

and Mental Hygiene ("DHMH") in Cumberland, Maryland.[1] Appellant soon thereafter refused to take medication (Lithium and Thiothixene) that was prescribed for her by Dana Calderone, M.D., her attending physician, to treat appellant's mental problem, diagnosed as "schizoaffective disorder."[2] On 27 July 1993, appellant received notice that a clinical review panel ("panel") would be convened on the following day to determine whether medication would be administered to her despite her refusal to take it willingly.[3] After appellant received notice

1. Appellant's initial admission for treatment during this continuous period of commitment began on 14 July 1993. *See generally Beeman v. Department of Health & Mental Hygiene*, 105 Md.App. 147, 658 A.2d 1172 (1995) (hereinafter referred to as *"Beeman I "*).

2. "The essential feature of Schizoaffective Disorder is an uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at p. 292 (4th ed. 1994). "Criterion A" for Schizophrenia requires "[t]wo (or more) of the following [characteristic symptoms], each present for a significant portion of time during a 1–month period (or less if successfully treated):
 (1) delusions
 (2) hallucinations
 (3) disorganized speech (e.g., frequent derailment or incoherence)
 (4) grossly disorganized or catatonic behavior
 (5) negative symptoms, i.e., affective flattening, alogia, or avolition."
*Id.* at 285. Additionally, the diagnostic criteria require that "during the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms." *Id.* at 292. "[T]he mood symptoms must also be present for a substantial period of the total duration of the illness." *Id.* Furthermore, "the disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition." *Id.* at 296. The term "period of illness" in this context
 refers to a time period during which the individual continues to display active or residual symptoms of psychotic illness. For some individuals, this period of illness may last for years or even decades. A period of illness is considered to have ended when the individual has completely recovered for a significant interval of time and no longer demonstrates any significant symptoms of the disorder.
*Id.* at 292.

3. The panel was composed of Sandra Howard, M.D., Allen Kirk, M.D., and James Crable, a pharmacist. Pursuant to Md.Health–Gen.Code Ann. ("HG") § 10–708(c)(1), Drs. Howard and Kirk represented the

that the panel would be assembling, but before the scheduled meeting, appellant consulted with her rights advisor,[4] Ms. Delores Ortiz, who provided her with information and assistance regarding the upcoming meeting with the panel.

The panel convened as scheduled on 28 July 1993, with appellant and her rights advisor, among others, present. The panel approved the use of forced medication to treat appellant's mental disorder for a period not to exceed ninety days, and documented its decision as required by HG § 10–708(i).[5] Appellant received written notice of the panel's decision on Friday, 30 July 1993 at approximately 9:30 a.m.

That same Friday, after receiving notice of the panel's decision, appellant met twice with Ms. Ortiz, who advised appellant of her statutory right to appeal the decision of the panel to an administrative law judge ("ALJ") of the Office of Administrative Hearings ("OAH")[6] and left with appellant the partially completed appeal form. All that remained to be done to the form in order to perfect an appeal was for appellant to affix her signature to it, write in the date and time, and deliver the form to any Finan Center staff person. Ms. Ortiz also left additional copies of the appeal form in appellant's chart and in

---

"physician designee of the clinical director" and the psychiatrist, respectively. The pharmacist constituted the "mental health professional, other than a physician."

4. The "rights advisor" is known in the Code as a "lay advisor" and is defined in HG § 10–708(a)(4) as "an individual at a facility, who is knowledgeable about mental health practice and who assists individuals with rights complaints."

5. The medicines approved by the panel were Navane, Cogentin, and Propranolol. While the panel felt that Lithium was also indicated to treat appellant's mental condition, they decided not to impose its use on appellant because of the additional necessity of forcing her to undergo continuing lab work to monitor safely the treatment.

6. HG § 10–708(k) states, in pertinent part:

(1) An individual may request an administrative hearing to appeal the panel's decision by filing a request for hearing with the chief executive officer of the facility or the chief executive officer's designee within 48 hours of receipt of the decision of the panel.

the charting room. Moreover, Ms. Ortiz notified staff at the Finan Center, and particularly those assigned to appellant's cottage, that appellant may want to appeal the panel's decision over the upcoming weekend. Although appellant had previously appealed at least one prior panel decision requiring her to submit to forced medication, and often initiated contact with an attorney at the Legal Aid Bureau office in Cumberland, she did not express ostensibly to anyone a desire that she wanted to appeal the panel's decision in this case on 30 July, 31 July, or on 1 August 1993.

The forty-eight hour deadline for taking an administrative appeal, provided by HG § 10–708(k)(1), *supra*, n. 6, expired on 1 August 1993 at approximately 9:30 a.m. Thereafter, on 2 August 1993, after another meeting with her rights advisor, in which appellant made no outward expression of a desire to appeal, medication was administered to appellant, pursuant to the panel's decision, at approximately 10:00 a.m. Later on 2 August 1993, at approximately 3:50 p.m., roughly thirty hours past the statutory deadline, appellant tendered a hand written letter to Finan Center staff, indicating that she wanted to appeal the panel's decision.

Appellee, DHMH, filed with the OAH a motion to dismiss appellant's appeal on the ground that it was not timely filed. The assigned ALJ held an evidentiary hearing on the motion to dismiss at the Finan Center on 13 August 1993. At that hearing, appellant was represented by an attorney from the Legal Aid Bureau who was familiar with her background and current predicament. On 22 October 1993, the ALJ issued her written decision and order dismissing appellant's appeal, finding generally that (1) appellant was properly advised of her appeal rights and otherwise had the assistance required by law of her rights advisor; (2) appellant had timely filed an appeal on at least one prior occasion, but did not do so in the present case; and (3) that she was "not persuaded that [§ 10–708 was] unconstitutional nor [was she] persuaded that the statute was applied [to appellant] in an unconstitutional man-

ner." [7]

Appellant timely sought judicial review of the decision of the ALJ by the Circuit Court for Allegany County on 4 November 1993, pursuant to HG § 10–708($l$)(1). Appellant persuaded the circuit court, over appellee's objection, not to employ the statutorily provided expedited appeal proceedings under HG § 10–708($l$)(4), which would have required a decision by the circuit court within seven days, but rather to proceed under the more relaxed time provisions of Maryland Rule 7–201, *et seq.* This decision enabled appellant to prosecute *Beeman I* on the faster track before having to move forward on the instant appeal. Oral argument was held on the instant appeal on 8 July 1994. The court took the matter under advisement following the hearing. While the matter was pending *sub curia,* on 18 August 1994, after having received the full course of treatment approved by the panel, appellant was discharged from the Finan Center. On 8 December 1994, the circuit court issued its written opinion and order affirming the decision of the ALJ. Appellee has moved to dismiss the instant appeal as moot. Additional facts will be supplied as necessary in our discussion of the issues we address.

## *DISCUSSION*

### *MOOTNESS*

■ Appellee contends that the issues raised by appellant in this appeal are moot because the clinical review panel's decision approving the forced medication of appellant, on which this appeal is based, expired approximately on 28 October 1993, and any reversal of the ALJ's dismissal of appel-

---

7. This was the sum of the ALJ's analysis or reasoning as to the constitutional challenge. Administrative proceedings may be the first forum in which constitutional challenges to statutes are permitted (even required, in certain situations) to be litigated, and in those circumstances, ALJ's should not simply "blow by" those issues because they are raised in an administrative, quasi-judicial, as opposed to a purely judicial, forum. *Insurance Commissioner v. Equitable Life Assurance Society,* 339 Md. 596, 619, 622–24, 664 A.2d 862 (1995) (and cases cited therein).

lant's appeal and remand for a hearing on the merits would be meaningless. Thus, appellee asserts that the instant appeal should be dismissed.[8]

■ As the Court of Appeals explained in *Attorney Gen. v. Anne Arundel Cty. Sch. Bus,* 286 Md. 324, 327, 407 A.2d 749 (1979):

> A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.

Furthermore, "courts of appeal 'do not sit to give opinions on abstract propositions or moot questions; appeals which present nothing else for decision are dismissed as a matter of course.'" *Beeman I, supra,* 105 Md.App. at 157, 658 A.2d 1172 (quoting *In re Riddlemoser,* 317 Md. 496, 502, 564 A.2d 812 (1989)). We agree with appellee that the question of whether appellant's appeal to the OAH should have been dismissed is moot because, no matter how we would resolve the question, it would be impossible for us to provide an effective legal remedy for appellant when she has already been medicated pursuant to the 28 July 1993 panel decision and subsequently released from the Finan Center. The fact that the issues are moot, however, does not preclude *per se* our consideration of the issues raised.

■ Although the instances in which courts will depart "from the general rule and practice of not deciding academic questions" are rare, they have been articulated as follows:

> [I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court

---

8. Our power to dismiss moot appeals is set forth in Md. Rule 8–602(a)(10).

may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.

*Mercy Hosp., Inc. v. Jackson,* 306 Md. 556, 562–63, 510 A.2d 562 (1986) (quoting *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379 (1954)).

When applying the standard expressed in *Lloyd* to the questions presented in the instant case, we conclude that our review and resolution of issue I, subject to our discussion in n. 13 and n. 15, *infra,* is appropriate. The forcible administration of medication to patients confined in state hospitals undoubtedly concerns "a relationship between the government and its citizens." *Beeman I, supra,* 105 Md.App. at 158, 658 A.2d 1172. Similarly, we are convinced that ensuring that forced medication procedures are conducted in concordance with constitutional due process principles is a "matter of important public concern." *See Williams v. Wilzack,* 319 Md. 485, 573 A.2d 809 (1990) (holding that previous version of HG § 10–708 violated due process rights of patients, discussed *infra* ).

Additionally, the situation involved here is likely to recur as to appellant and others similarly situated.[9] The parties do not seriously dispute that appellant's schizoaffective disorder is generally resistant to treatment, depending, *inter alia,* on the regularity with which she takes her medicine. The record also reflects that appellant has habitually refused to take her prescribed medicine voluntarily in the past, requiring repeated involuntary admissions to the Finan Center, thus perpetuating the issues raised here. *See Beeman I, supra,* 105 Md.App. at 152, 658 A.2d 1172. Moreover, while not part of the record in this case, statistics compiled by DHMH in its evaluation reports on clinical review panels contained in the statute's legislative history indicate that, in fiscal years 1992, 1993, and

---

**9.** In reaching this conclusion, we did not rely on appellant's prior admission records at the Finan Center, which were not included in the record extract (because it was not in the record made before the ALJ), but was included by appellant in an appendix to her reply brief.

1994, clinical review panels convened in Mental Hygiene Administration ("MHA") facilities approved forced medication in 175 cases per year, from which 73 appeals were taken annually to the OAH, on average.[10] These numbers are certainly large enough to convince us that the potential for recurrence of the issues raised here with respect to the exercise of appeal rights is of substantial magnitude.

Lastly, because forced medication decisions are only valid for ninety days from their date of issuance, HG § 10–708(m), "even an expedited appeal is not sufficiently swift to assure review of an order authorizing forced administration of antipsychotic medications." *Beeman I, supra,* 105 Md.App. at 159, 658 A.2d 1172. Therefore, upon subsequent recurrences of the issues properly presented in this case, because of inherent time constraints, the same difficulty that rendered the present appeal moot would also prevent later cases from being reviewed ordinarily. Accordingly, being satisfied that the *Lloyd* factors "concur with sufficient weight," we shall address the merits of appellant's case as properly raised on this record by issue I.

## STANDARD OF REVIEW

Before we begin our examination of the disputed issues, we note the scope of review we shall apply. The scope of review on appeal to this court is substantially that of the circuit court—we must review the administrative decision itself. *Beeman I, supra,* 105 Md.App. at 154, 658 A.2d 1172 (citing *Public Serv. Comm'n v. Baltimore Gas & Elect. Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974)) (other citations omitted). The decision of the ALJ in the instant case constituted a final decision for judicial review purposes under the Administrative Procedure Act ("APA"), codified at Md. State Gov't Code Ann. ("SG") § 10–101 *et seq.* HG § 10–708(k)(9). Pursuant to the APA, whether the reviewing court is a circuit court or an appellate court, *Kohli v. LOOC, Inc.,* 103 Md.App.

---

**10.** *See* Bill Files for H.B. 482 (1995); and H.B. 170 (1993).

694, 708, 654 A.2d 922 (1995) (citing *Fort Washington Care Ctr. v. Department of Health and Mental Hygiene*, 80 Md. App. 205, 213, 560 A.2d 613 (1989)), it may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(v) is arbitrary or capricious.

SG § 10–222(h) (Supp.1995).

 Although the primary thrust of appellant's contentions of error put forth in this appeal is constitutional in nature, the ALJ's conclusion that appellant's administrative appeal should be dismissed was also dependent on her factual findings. A distinction is drawn in the scope of review depending upon whether the court is reviewing an administrative agency's findings of fact as opposed to purely legal conclusions. "To the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test." *Department of Human Resources v. Thompson*, 103 Md.App. 175, 190, 652 A.2d 1183 (1995) (citing *State Election Bd. v. Billhimer*, 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Anderson v. Department of Public Safety*, 330 Md. 187, 213, 623 A.2d 198 (1993) (quoting *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119 (1978)). In utilizing the substantial evidence test, an appellate court does not substitute its judgment, even on the question of the appropriate inference to

be drawn from the evidence, for that of the agency. *E.g.,*
*Liberty Nursing Ctr., Inc. v. Department of Health and*
*Mental Hygiene,* 330 Md. 433, 442, 624 A.2d 941 (1993) (and
cases cited therein). Rather, the test is a deferential one,
requiring restrained and disciplined judicial judgment so as
not to interfere with the factual conclusions of the agency that
are adequately supported by the record. *Billhimer, supra,*
314 Md. at 58, 548 A.2d 819.

▮▮▮ A different, more expansive standard applies to pure-
ly legal conclusions, i.e., "where the agency's decision is predi-
cated solely upon an error of law, no deference is appropriate
and the reviewing court may substitute its judgment for that
of the administrative agency." *Kohli, supra,* 103 Md.App. at
711, 654 A.2d 922 (citing *Washington Nat'l Arena v. Comp-*
*troller of Treasury,* 308 Md. 370, 378–79, 519 A.2d 1277
(1987)); *see, e.g., Liberty Nursing, supra,* 330 Md. at 443, 624
A.2d 941 (citing *Ramsay, Scarlett & Co. v. Comptroller,* 302
Md. 825, 837, 490 A.2d 1296 (1985)). Therefore, the ALJ's
conclusion regarding the impact of appellant's constitutional
due process challenge will not be given the same deference in
our analysis as her fact-finding.

### STATUTORY BACKGROUND

In 1990, the Court of Appeals, in *Williams v. Wilzack,*
*supra,* declared the prior version of HG § 10–708 unconstitu-
tional because it contravened procedural due process protec-
tions of both the state and federal constitutions. The specific
due process requirements, mandated by the United States
Supreme Court in *Washington v. Harper,* 494 U.S. 210, 110
S.Ct. 1028, 108 L.Ed.2d 178 (1990), that the *Williams* court
indicated the prior statute lacked were: (1) "advance notice of
the proceedings before the clinical review panel;" (2) the right
of the patient [11] "to be present" when the panel convened; (3)

---

**11.** Both *Williams* and *Harper* dealt with the due process rights of a
mentally ill prisoner to refuse medication, and those cases employ the
term "inmate" as opposed to "patient," the latter of which is more
applicable to the case at bar.

"to present evidence[; (4)] to cross-examine witnesses[; (5)] to have the assistance of an advisor who understands the psychiatric issues involved[;] and [(6)] to obtain judicial review of an adverse panel decision before its implementation." *Williams, supra,* 319 Md. at 509, 573 A.2d 809.

After *Williams* invalidated HG § 10–708, psychiatric facilities in Maryland were not able to administer antipsychotic medication involuntarily to mental patients who refused it unless a court declared the patient incompetent and the appointed guardian approved the administration of the medicine. *See* Bill Analysis of H.B. 588 (1991). In response to *Williams,* a Mental Hygiene Administration task force, consisting of mental health consumers, advocates, attorneys, doctors, and state officials, was assembled to draft proposed legislation, which was later enacted by the Maryland General Assembly in 1991 as the successor statute to the invalidated HG § 10–708. The revised statute provided for enlarged procedural safeguards purportedly in order to comport with the due process requirements as defined by caselaw.[12] In addition, the 1991 revision of the statute included a "sunset provision," i.e., the statute would expire on its own terms two years from its effective date of 1 July 1991. The new statute also directed that an evaluation report recommending either reestablishment or termination of the revised statute was to be prepared by DHMH and submitted to the Governor and the General Assembly by "the end of 1 January 1993." Ch. 385, § 2 (Acts of 1991).

During the 1993 legislative session, DHMH submitted its evaluation report recommending reestablishment of the revised HG § 10–708. The constituency that was represented on the original task force, augmented by the Legal Aid Bureau, Inc., commented on this proposal. The Maryland Disability Law Center and the Legal Aid Bureau, Inc., concerned generally with a patient's competency to understand the process, recommended that the statute be further revised,

---

12. The procedural protections are discussed more thoroughly, *infra.*

*inter alia,* to require a clinical review panel, before it decided to order forced medication, essentially to determine whether the individual lacked the capacity to make or communicate responsible or reasonable decisions concerning mental health treatment or other personal matters. DHMH opposed such an amendment because, absent specific instances of "miscarriages of justice" under the present statute, it "would place additional burdens, in terms of both time and money, on providers." The legislature did not include the proposed amendments from these advocacy groups in the adopted bills.

The expiration period of the statute was thereafter extended until 1 July 1995, with another evaluation report being required in January of 1995. Ch. 135 § 1 (Acts of 1993). DHMH submitted another evaluation report, upon which the task force constituency again commented, for the 1995 legislative session, at which the statute was further extended until 1 July 1999, with another evaluation report being due at the end of 1 January 1999. Ch. 266 (Acts of 1995). Concerning the 1995 session proposal, the Maryland Disability Law Center advocated, once again without avail, the need to include a provision requiring the review panel to determine, concurrently with any decision to force medication, the competency of the patient to make or communicate reasonable decisions concerning his or her treatment. Additionally, another patient advocacy group, On Our Own of Maryland, Inc., unsuccessfully proposed a mandate that legal counsel be provided for a patient at the time the panel convenes.

Having considered the history of the statute, we turn now to address the contentions of appellant.

## I.

### *DUE PROCESS*

Appellant contends that the application of the forty-eight hour appeal period provided in HG § 10–708(k)(1) to her in this case, without assessing or accounting for her mental capacity to understand and exercise her appeal rights during that period, violated her due process rights under the Four-

teenth Amendment or Article 24 of the Maryland Declaration of Rights.[13] Essentially, according to appellant, in order for the statute to withstand constitutional scrutiny, it must be construed as requiring a determination of the patient's mental competency to understand his or her administrative appeal rights concurrent with notice being given to the patient of the clinical review panel's decision to medicate forcibly. Appellant submits that, if it is determined that the patient lacks the mental capacity to understand his or her right of appeal at that time, the appeal should be automatically docketed, and the matter should proceed to the ALJ. Alternatively, appellant argues that if the appeal is filed late, as it was in the instant case, the matter should also proceed to the ALJ as a

---

**13.** Appellant only argued below that the statute was unconstitutional *as applied* to her because it did not afford her with *procedural* due process under the Fourteenth Amendment. She did not challenge the statute on its face, i.e., she did not contend that it was unconstitutional in every possible application. Likewise, appellant did not raise *substantive* due process issues below. Moreover, she did not assert her companion argument before the ALJ or the circuit court that Article 24 of the Maryland Declaration of Rights was also violated; however, as the meaning of both constitutional provisions is analogous, *see infra,* it does not affect our analysis, and we exercise our discretion to consider it. *See, e.g., Crown Oil v. Glen,* 320 Md. 546, 561, 578 A.2d 1184 (1990).

In that same vein, appellant makes certain "equitable tolling" arguments under the umbrella of her due process argument. She states in n. 3 of her brief that "[e]quitable tolling ... provides an alternative ground for reversing the Circuit Court's decision in the present case." As we are holding that due process, which incorporates the concept of fundamental fairness, *see, e.g., Maryland State Police v. Zeigler,* 330 Md. 540, 559, 625 A.2d 914 (1993); *Meyers v. Montgomery County Police Dept.,* 96 Md.App. 668, 698, 626 A.2d 1010 (1993) (citations omitted), is not offended by the statute as currently codified, appellant's equitable tolling argument, even if specifically preserved below, would not serve as an independent ground of reversal because fairness is the platform on which the doctrine of equitable tolling rests. *See Nixon v. State,* 96 Md.App. 485, 500–08, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993) (Discussing the doctrine of equitable tolling as it relates to statutes of limitation in Maryland, and noting that "Maryland has not expressly adopted the federal equitable tolling standard" in the context of the Maryland Equal Pay Act.).

We can appreciate that appellant is becoming more creative as this litigation (and from the resolution of *Beeman I*) proceeds. However, we will not allow appellant's arguments to grow and multiply on this appeal. *See* Md. Rule 8–131, discussed in II, *infra.*

matter of course for a determination of whether the time limit should be waived because of the patient's lack of capacity to understand and exercise the right of appeal during the forty-eight hour period. Thus, she continues, since the ALJ in this case only determined whether the requirements of the statute were adhered to by DHMH and whether appellant noted her appeal within the forty-eight hour period, and not whether appellant was mentally competent to understand and act on her administrative appellate rights, her constitutional rights were thereby infringed. Although appellant has only preserved, on this record, an "as applied" due process challenge (*see* n. 13, *supra* ), her contention presents us with the opportunity to determine whether HG § 10–708, revised in response to *Williams v. Wilzack, supra,* comports with due process.[14] We conclude that additional protections are not required to be judicially engrafted to the already hybridized vine and protecting leaves of the statute as currently codified in order to save it from the constitutional phylloxera infestation identified by appellant.

As a threshold matter, we note that the due process clauses of Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning. *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980). We also acknowledge that legislative acts are presumed to be constitutional, and that a person challenging a statute has the burden of affirmatively establishing its invalidity. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 579, 414 A.2d 1246 (1980) (citing *Governor of Maryland v. Exxon Corp.,* 279 Md. 410, 426, 372 A.2d 237 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Salisbury Beauty Sch. v. State Bd. of*

---

14. *See Vavasori v. Commission on Human Relations,* 65 Md.App. 237, 243, 500 A.2d 307 (1985), *cert. denied,* 305 Md. 419, 504 A.2d 1152 (1986) (Judge Karwacki, then a member of this Court, was presented with what was essentially an as applied due process challenge to Article 49B. The opinion nevertheless addressed broader issues concerning whether the statute, as codified, comported with due process concerns).

*Cosmetologists,* 268 Md. 32, 48, 300 A.2d 367 (1973)); *Depart-ment of Natural Resources v. Linchester,* 274 Md. 211, 218, 334 A.2d 514 (1975) (citing *Maryland Bd. of Pharmacy v. Sav–A–Lot,* 270 Md. 103, 106–07, 311 A.2d 242 (1973); *Salis-bury Beauty Sch., supra,* 268 Md. at 48–49, 300 A.2d 367).

■ Before reaching the issue of whether appellant was provided with sufficient procedural due process, we must first be satisfied that, as a substantive matter, appellant has a constitutional interest in avoiding the administration of anti-psychotic drugs. We believe that she has a significant consti-tutional liberty interest in being free from the arbitrary and capricious administration of such medicines.[15] *See Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); *Washington v. Harper, supra,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990); *United States v. Charters,* 863 F.2d 302, 305 (4th Cir.1988), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990).

■ Having found the existence of a substantive constitu-tional interest, we next consider whether the existing statuto-ry procedural protections adequately protect appellant. "[D]ue process does not require adherence to any particular procedure. On the contrary, due process is flexible and calls only for such procedural protections as the particular situation demands." *E.g., Maryland Racing Comm'n v. Castrenze,* 335 Md. 284, 299, 643 A.2d 412 (1994) (citing *Department of Transp. v. Armacost,* 299 Md. 392, 416, 474 A.2d 191 (1984)). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court formulat-ed a balancing test that it continues to employ in evaluating due process questions.

---

**15.** Appellant also argues that she has a "fundamental right of bodily privacy against forced treatment with psychotropic drugs." In that we are reaching the procedural issues on the basis that there is a signifi-cant liberty interest raised, it is unnecessary for us to conclude that this specific right exists in this case, especially since it was not raised below. *See* n. 13, *supra.*

[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334–35, 96 S.Ct. at 903. The parties agree that this is the balancing test to be employed in this case.

 The first *Mathews* factor, the nature of the private interest affected, was discussed above as being a significant right. Nevertheless, as was recognized in *Charters, supra,* constitutional interests retained by involuntarily committed individuals "must yield to the legitimate government interests that are incidental to the basis for the legal institutionalization, and are only afforded protection against arbitrary and capricious government action." *Charters, supra,* 863 F.2d at 305 (citations omitted). Appellant was involuntarily retained at the Finan Center because she needed mental health treatment. *See* HG §§ 10–613 to 10–633 (describing the criteria and procedures for involuntary admissions). Thus, the governmental interest in providing appellant with the mental health care that she required must also be considered alongside appellant's interest in being free from arbitrary and capricious government action.

The second factor in the *Mathews* balancing test is really the main focus of the constitutional questions raised on this appeal. This is especially so because the record of appellant's case, as opposed to the legislative history of the statute, is completely devoid of any empirical data that could be used to formulate an argument one way or the other on the final factor, i.e., the fiscal or administrative burdens that the additional procedures requested by appellant would place upon the

State.[16] The second factor looks first at the risk of an erroneous deprivation of appellant's constitutional interests through the existing procedures. Without considering the due process safeguards afforded to appellant relating to her involuntary admission to the Finan Center, but focusing solely on the forced medication at issue, the following procedural protections are provided by the statute:

(1) Medication cannot be administered to a patient in a nonemergency situation, unless the patient is hospitalized involuntarily and the medication is approved by a clinical review panel, HG § 10–708(b), and in any event, medication cannot be involuntarily administered for a period of longer than 90 days, without another panel being convened and approving a renewal. HG § 10–708(m);

(2) Notice of the panel must be given to the patient and the lay advisor at least 24 hours prior to the convening of the panel. HG § 10–708(d);

(3) The notice provided must include the date, time, location, and purpose of the panel, and must also describe the following rights of the patient:

(a) the right to attend the meeting of the panel;

(b) to present information to the panel, including witnesses;

(c) to ask questions of any person presenting information to the panel;

(d) to request assistance from a lay advisor; and

---

**16.** Appellee included in the appendix to its brief the affidavit of Ms. Paula Carolyn Bell, DHMH's Director of the Resident Grievance System, which contained certain selected statistics regarding the number of clinical review panels and the number of administrative appeals. This evidence was not, however, part of the record before the ALJ in this case, and we did not rely upon it. Just as appellant's effort to augment the record via the appendices to her brief was inappropriate, *see* n. 9, *supra,* so too was this inclusion by appellee. We also note in passing that the statistics selected by appellee (Fiscal Year 1995 in MHA inpatient facilities) were not representative of the data contained in the legislative history cataloging similar statistics for the three prior fiscal years.

(e) to be informed of their diagnosis and an explanation of the clinical need for the medication, including potential side affects, and the material risks and benefits of taking or refusing the medicine. HG § 10–708(e);

(4) Once a decision has been made by the panel to medicate, pursuant to the contours set forth in HG § 10–708(g) and (h), it must be documented with notice given to the patient of his or her right to request a hearing under HG § 10–708(k), his or her right to counsel, and the name, address, and telephone number of the State protection and advocacy agency and the Lawyer referral service. HG § 10–708(i);

(5) The patient is entitled to the benefit of the lay advisor, who, after the panel has approved the medication, shall promptly inform the patient of his or her right to appeal under subsection (k), insure that the patient can access a telephone, and notify the appropriate personnel if the patient desires to appeal. HG § 10–708(j);

(6) The patient has the right, within forty-eight hours of receipt of the decision by the panel to appeal the decision to an administrative law judge, with the administration of medicine being stayed during that forty-eight hour period, or, if a hearing is requested, the stay continues until the administrative decision is issued. HG § 10–708(k); and

(7) The patient is given the further right to expedited judicial review of the ALJ's decision on the record to the circuit court within fourteen days of the administrative decision. HG § 10–708(*l*).

In comparing the aforementioned protections with the deficiencies of the prior statute enunciated in *Williams v. Wilzack,* discussed in the Statutory Background section, *supra,* we conclude that the present statute satisfies constitutional due process requirements. All of the prior defects brought to light in *Williams* have been cured, and additional safeguards have been added by the legislature in the revised statute.

Furthermore, with respect to appellant's specific assertion that a determination of a patient's mental capacity to understand and exercise appeal rights is constitutionally re-

quired, we must examine the statute in relation to other existing law. As was recognized in *Williams,* the statute, in its entirety, is a narrow legislative exception to the common law rule that a physician cannot administer treatment of any kind to a patient without that patient's consent, absent emergency circumstances. *Williams, supra,* 319 Md. at 494, 573 A.2d 809 (quoting *Sard v. Hardy,* 281 Md. 432, 439, 379 A.2d 1014 (1977)). The law of Maryland presumes that adults are competent to make their own informed decisions, and this presumption of competency does not disappear upon an involuntary admission to a mental health facility for psychiatric treatment, absent a proper determination otherwise. *See* HG § 5–601(f) (" 'Competent individual' means a person who is at least 18 years of age or who under § 20–102(a) of this article has the same capacity as an adult to consent to medical treatment and who has not been determined to be incapable of making an informed decision."); *see also, Wall v. Heller,* 61 Md.App. 314, 326, 486 A.2d 764, *cert. denied,* 303 Md. 297, 493 A.2d 350 (1985) (In the context of capacity to make a will, "the law presumes that every man is sane and has capacity to make a valid will.") (citations omitted); 60 Op. Att'y Gen. 208 (1975) (Mental patients retain their right to vote, provided they have not been declared judicially incompetent and have had a guardian appointed.); *Hill v. State,* 35 Md.App. 98, 105, 369 A.2d 98 (1977) (Presumption of competency of accused to stand trial.). The legal distinction between competency or incompetency can be determined in a judicial forum, whether under Title 13 of the Estates and Trusts Article of the Annotated Code of Maryland or otherwise. There is no separate need for a specialized administrative competency determination, unless the legislature expresses a desire to carve a broader exception to the presumption of competency.[17]

---

**17.** As noted earlier, as part of the legislative history of HG § 10–708, though not explicitly made part of the record in this case, the Maryland Disability Law Center and the Legal Aid Bureau made proposals to the legislature in 1993 and in 1995 regarding certain competency determinations (although not specifically with respect to understanding the right to appeal), none of which were adopted. Moreover, as the

The inherent "safety valve" for those who lack the mental capacity to understand their right of appeal is to have their appointed guardian, or other person to whom they granted a limited durable power of attorney, make the appeal decision on their behalf. Accordingly, when HG § 10–708(k) is analyzed in *pari materia* with the rest of the statute, as well as the presumption of competency, the risk of an erroneous deprivation of appellant's right to be free from the arbitrary and capricious administration of antipsychotic medications within the existing procedural protections is not so great as to warrant our embrace of the relief sought in this case.

The other portion of the second *Mathews* factor appraises the probable value, if any, that the procedures proposed by appellant would have in minimizing the risk of an erroneous deprivation of her rights. The determination of mental capacity that appellant seeks would be made at the time of receiving notice of the panel's decision. Counsel for appellant suggested at oral argument that the competency determination could be made by a "mental health professional" within the facility where the patient is retained. Even assuming, *arguendo,* that it was determined that the patient could not fully understand his or her right of appeal sufficient to enable him or her to decide properly whether to exercise it *vel non,* and yet he or she nevertheless received the automatic administrative appeal that appellant is urging this Court to grant, the administration of medicine and the rest of the therapeutic regimen would be stayed at least until the ALJ issued his or her decision. Moreover, it is doubtful that patients who cannot understand their right of appeal can effectively communicate with and provide assistance to their counsel before the ALJ, especially with at least a portion of their treatment plan placed on hold.

We are certainly not unmindful of the gravity of the personal liberty rights at stake in this case and of the value of the

---

legislative history also reveals, in the immediate post-*Williams* void, resort to *ad hoc* judicial determinations of competency was the chief, if not only, legal resort in forced medication cases. In today's post-*Williams* era, there is no reason to believe that such a venue is any less available.

administrative appeal, especially in terms of it being the gateway to judicial review of the panel's decision; however, we do not believe that the scope of due process requires the requested additional procedures. In the most basic analysis, in light of the existing presumption of competency and the availability of appointed guardians, the competency assessment that appellant requests is not an essential safeguard. The legislature may, in the future, deem such a procedure desirable, but such considerations as who should make the competency determination, at what point it should be made, whether it can be appealed, how long the right for the administrative appeal will remain open, and how much any additional hearings and subsequent judicial review will cost the State, particularly make these issues better suited to be resolved by the executive and legislative branches of government rather than by this Court.[18]

As discussed above, no data has been presented properly to us in the record on the third *Mathews* factor sufficient to weigh it in our analysis.

## THE ADMINISTRATIVE DECISION

 Being satisfied that the statute as written comports with due process concerns, we next review the administrative decision itself. Affording appropriate deference to the factual findings, we hold that they were based on substantial evidence. The record adequately supports the findings that: (1) appellant had appealed at least one panel decision before; (2) appellant had the assistance of a lay advisor who was familiar with psychiatric issues, clinical review panels, and the appeals process; (3) appellant had access to a telephone and had regularly initiated contact with her Legal Aid Bureau coun-

---

18. That is not to say, however, that if we had been presented with a proper record from which we could conclude that the statute, as written, violated appellant's due process rights, we would not declare it constitutionally invalid, and thus unenforceable against appellant. *See Williams v. Wilzack, supra.*

sel;[19] and (4), despite being questioned several times by her rights advisor if she desired to appeal, appellant did not in any way indicate a desire to appeal during the forty-eight hours following the decision of the panel.[20] Accordingly, the requirements of HG § 10–708(k) not having been met by appellant, we find no error by the ALJ in dismissing her appeal because it was untimely brought.

To the extent that appellant maintains that she was entitled to have her ability to appreciate and act on her appeal rights during the pertinent forty-eight hour period determined as a result of the proceeding before the ALJ, we hold that she had a full and fair opportunity to produce any evidence bearing on that issue, and that she availed herself of that opportunity. Her attorney called as witnesses Ms. Ortiz,[21] Dr. Calderone, and Ms. Beeman herself. DHMH, represented by an Assistant Attorney General, limited itself to cross-examination of appellant's witnesses and written affidavits of certain Finan Center staff. Our review of the record leads us to conclude that Ms. Beeman's awareness of her appeal rights prior to and during the relevant forty-eight hour period was specifically explored. For example, during appellant's counsel's cross-examination of Ms. Ortiz, the following colloquies occurred:

---

**19.** Appellant did request that she be allowed to contact an attorney, Paul Sullivan, Esquire, concerning a house that she believed she owned. She made a telephone call to his office the morning of 2 August 1993.

**20.** Of the multiple contacts between Ms. Ortiz and appellant during the time period involved here, appellant's only reported response to a pertinent query—whether appellant wanted assistance from the Legal Aid Bureau—was "what for, they never do anything—just talk."

**21.** Counsel for appellant at the ALJ's hearing initially announced her intent to call Ms. Ortiz as appellant's witness. When DHMH offered Ms. Ortiz's affidavit in evidence as part of its case-in-chief, appellant's counsel lodged a hearsay objection based on the availability of the live witness. To save time, counsel for DHMH called Ms. Ortiz as a witness. Thus, appellant, through a liberally allowed cross-examination, obtained from Ms. Ortiz what she had intended to obtain earlier through calling her as her own witness.

Q. Ms. Ortiz, in your affidavit you said that Ms. Beeman is calmer and more cooperative since taking the medication, is that right?

A. Yes.

Q. What was she like before she took the medication?

A. She seemed to me to be in a lot of anguish and mental pain and she wasn't being able to communicate. She was able to communicate, but she was more nervous, more hyper.

Q. When she was able to communicate, was she able to communicate meaningfully?

A. At times.

Q. At times she was not able to communicate meaningfully, isn't that right?

A. Yeah, I guess so. I mean, I'm not with her all the time. When I was with her, she was able to understand and was able to use the phone and you know that. She called you all the time.

Q. Can you tell me—in fact, she was not able to communicate meaningfully a lot of the time. Sometimes she was basically incoherent, isn't that right?

A. Pardon me? With you? With me?

Q. In your observations of Ms. Beeman, wasn't she most times basically incoherent?

A. Off and on, sure.

Q. And how often would that be?

A. I don't know that. When I spoke with her—I speak with patients several times a day.

Q. Okay. Do you know what it means to be delusional?

A. Yes.

Q. Ms. Beeman is delusional, isn't she?

A. At times, at times.

Q. And in fact at all times she's delusional about some things, isn't that right?

A. She will always be that way about two bodies, but that doesn't have anything to do with her being able to go out in the community. But that doesn't stop her from performing.

Q. Performing what?

A. In the community. Being able to be discharged.

\* \* \* \* \* \*

Q. Ms. Ortiz, you say that Ms. Beeman has always presented herself as one aware of her rights, isn't that right?

A. Yes.

Q. In fact, her awareness of her rights is largely delusional, isn't that right?

A. No, a lot of the times she is right on target.

\* \* \* \* \* \*

Q. How many of her—how many rights grievances have you processed for Ms. Beeman?

A. Oh, I don't know. Throughout the year—

Q. The last month, for example.

A. The last month?

Q. During this last month that we've finished.

[DHMH COUNSEL]: Objection.

THE WITNESS: Probably one or two.

When Dr. Calderone, appellant's treating physician, was called, Ms. Beeman's counsel developed the following testimony on direct examination as to the nature of Ms. Beeman's disorder generally (but without regard to the immediate time at or about the pertinent forty-eight hours with which the statute is concerned):

Q. So if I'm clear, with schizoaffective disorder a person would be exhibiting more delusions and a manic disorder it would be more a mood disorder, is that correct?

A. Well, schizoaffective disorder describes a disorder where you have a combination of mood disorder plus a schizophrenic trace, like delusions, hallucinations.

\* \* \* \* \* \*

Q. In fact, do you believe that Ms. Beeman has delusions?

A. Yes.

\* \* \* \* \* \*

Q. Are Ms. Beeman's delusions extremely overwhelming to her?

A. Yes.

Q. And in fact, would you agree with Sandra Koons who wrote that Ms. Beeman's delusional system overwhelms her?

A. Yes.

Q. What does that mean to you, to say that someone's delusional system overwhelms them?

A. Well, a delusion is a fixed idea of that that is not real.

\* \* \* \* \* \*

Q. When you say a delusional system overwhelms somebody, does that mean that because of her delusions she is unable to make rational choices?

A. Yes.

Q. About important issues in her life?

A. Yes.

Q. She's unable, perhaps, at sometimes to think coherently?

A. She would exceed poor judgment.

\* \* \* \* \* \*

Q. And in fact you would say her insight was basically nonexistent?

\* \* \* \* \* \*

A. None.

Q. Now, when you first decided to treat Ms. Beeman with medication, was she agreeable to that?

A. No, she refused.

 \* \* \* \* \* \*

Q. And was that refusal consistent over the term—did you treat her from the time she was in the hospital?

A. Yes.

 \* \* \* \* \* \*

Q. Was the refusal consistent or was she sometimes wishy-washy about it?

A. No, she refused all the time.

 \* \* \* \* \* \*

Q. And during that time would you say that her grasp of reality was good or bad?

A. Very bad.

 \* \* \* \* \* \*

Q. Do Ms. Beeman's delusions cause her to really believe what she is saying to be true is true?

A. Well, she believes what—a delusion is what sticks in your mind. And that's what she believes in.

At this juncture, appellant's counsel began focusing on specific knowledge that Dr. Calderone may have had with regard to appellant's mental condition at or near the time of the panel's decision (28 July) and the communication to her of her appeal rights (30 July).

Q. Can you look, if you could, for the psychiatric note, or your most recent psychiatric note that was closest to July 28th?

 \* \* \* \* \* \*

A. Okay, July 27.

Q. Okay, can you read what you wrote?

A. Patient is loud, terribly abusive. Patient is still refusing her medications, and is delusional. Patient exhibits

very poor judgment nor insight to her illness. Medical Panel hearing scheduled for tomorrow.

* * * * * *

Q. Okay. And in fact on July 20, 1993 you wrote that the patient was quite tangential, incoherent, illogical, is that correct?

A. Yes.

* * * * * *

Q. Okay. And the reason that you wanted to force medication on her was because she couldn't make good decisions on her own behalf, is that right?

A. Yes, she exhibited targeted deficiencies there.

Q. What do you mean by targeted deficiencies?

A. Well, she exercises poor judgment and she's quite delusional.

On cross examination, however, DHMH's counsel explored related areas with Dr. Calderone that revealed the following:

Q. Doctor, does Ms. Beeman know that she's in a psychiatric facility?

* * * * * *

A. She knows that she's in Finan Center.

Q. Does she know that you are her doctor?

A. Yes.

Q. Does she know what your role is as her doctor?

A. Yes.

Q. Did you explain to her the need for medication?

A. Yes.

Q. Do you believe that she has a basic understanding of any medication?

A. No.

* * * * * *

Q. To your knowledge, does Ms. Beeman know who Delores Ortiz is?

A. Yes.

\* \* \* \* \* \*

Q. That's a good question. Does Ms. Beeman ever express anger at her treatment?

A. Yes.

Q. In your opinion is she vocal about her treatment?

A. Yes.

\* \* \* \* \* \*

Q. In your opinion has Ms. Beeman shown that she has—she knows of her knowledge to refuse medication?

A. Yes.

\* \* \* \* \* \*

Q. Now Doctor, is it true that one can be delusional about one thing but yet rational—you know, rational mind as to other items?

A. Well, the mental state changes from moment to moment.

\* \* \* \* \* \*

Q. Is it possible for one to be delusional about one thing? For example, and I think we would all agree, that Ms. Beeman believes that there are other Arlena Beemans in existence?

A. Uh-huh.

Q. And yet is it possible that she could be rational as to other issues in her life?

A. Yes.

\* \* \* \* \* \*

Q. So she can be delusional as to certain aspects and yet comprehend that you are giving her medication?

A. Yes.

Q. You have had the opportunity to examine Ms. Beeman?

A. Yes.

Q. And you've had the opportunity to review her medical records?

A. Yes.

\* \* \* \* \* \*

Q. In your opinion, does Ms. Beeman have the ability to object to the administration of medication?

[APPELLANT'S COUNSEL]: Objection.

JUDGE: No, I'm going to allow that question. Overruled. Does she have the ability to object?

THE WITNESS: In her mental state, no she has no ability to object.

Q. What do you mean?

A. Well, she is exhibiting poor judgment, and her judgment is wrong.

Q. So you're saying doesn't have the ability meaning that she doesn't—would it be wrong—is it your statement that by the fact that she's refusing, she doesn't have the ability?

A. Well, that question, you know, depends on what the mental state is at that time. It changes from one moment to moment.

\* \* \* \* \* \*

Q. Over a period of 96 hours, four days, would Ms. Beeman, based on your past history with her, have periods that which she is lucid enough, rational enough, that she would be able to voice her objection to medication?

A. There would be times that she would be lucid.

Q. Would it be over a period of 72 hours?

[APPELLANT'S COUNSEL]: I'm going to object to this. First of all, it's calling for speculation as to whether or not—I mean, times when she was lucid. The second question is obviously whether or not Ms. Beeman is lucid in one 72 hour period and she may not be lucid in another 72 hour period.

JUDGE: I'm going to overrule the objection and let the Doctor answer.

THE WITNESS: Within a 72 hour period?

[DHMH'S COUNSEL]: Three days.

THE WITNESS: Three days. She can be at one point lucid.

\* \* \* \* \* \*

Q. Prior to August 2nd, the Monday of the administration of the medication, did Ms. Beeman have access to a telephone or to personal contact with either Delores Ortiz or [her Legal Aid Bureau attorney]?

A. Yes.

Q. And do you know if she had either telephone contact or in person visits with either of the two?

A. Telephone contacts, yes.

Q. With whom, [her Legal Aid Bureau attorney]?

A. Yes.

Q. To your knowledge, did [her Legal Aid Bureau attorney] make the call or did Ms. Beeman make the telephone call?

A. It was Ms. Beeman who made the calls.

Q. On her own?

A. Yes.

Finally, on redirect, appellant's counsel inquired:

Q. Between July 28th, or July 30th, excuse me. Between July 30th and August 2nd, for that particular 48 hours, was there any indication in the charts that you know that she was lucid at any time during that period?

A. Let me check. Did you say the 28th?

Q. The 30th, July 30th.

A. When you say lucid, what does that mean?

Q. Well, you said that she would be lucid during some period—some 48 hour period.

A. Uh-huh.

Q. What did you mean?

A. It means that she's acting accordingly. She's not incoherent, she's logical.

Q. And were there times when she was logical or not acting during that period?

A. Well, it was just a short period that she refused medication.

Q. And in fact on August 1st she cursed the nurse and she refused medication, isn't that right?

A. Let me see. Yes.

A fairly debatable issue was generated by the substantial evidence on the record thus developed as to whether this appellant, affected as she was by her mental disability, could not "reasonably be expected to conform to the short 48–hour deadline for exercising the important right to appeal." The ALJ concluded from this that there was substantial evidence to conclude that appellant understood her appellate right and had the capacities, both mental and physical, to exercise it; in effect, the presumption of competency had not been overcome by appellant. We shall not disturb that conclusion on this record.

## II.

Appellant also contends, in essence, that DHMH's rigid application of the forty-eight hour appeal deadline to Ms. Beeman in the present case, without making an assessment of her mental capacity to understand and exercise her appeal rights, discriminates against her because of her disability in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

Appellant did not advance this argument in the administrative proceeding or at the circuit court, raising it for the first time before this Court and imploring us to decide the merits of this issue, using our discretionary power to hear

unpreserved issues. We decline appellant's invitation to do so.[22]

Maryland Rule 8–131(a) states that:

Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

The "clear meaning" of Rule 8–131(a) "is that no unpreserved appellate issue, other than jurisdiction, may serve as the reason for an appellate reversal." *Wieland v. State*, 101 Md.App. 1, 34, 643 A.2d 446 (1994). The only circumstance in which the "extraordinary but limited exception" to the foreclosure of a reviewing court addressing an unpreserved issue is applicable occurs when the case is going to be remanded for further proceedings. *Id.* Accordingly, as there can be no remand in the present case because the questions raised are moot, the exception to the Rule does not apply, and we shall not decide this issue.

**DECISION OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMING THE DISMISSAL OF APPELLANT'S APPEAL IS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

**22.** Our decision not to review and resolve this issue is not inconsistent with our decision to consider appellant's argument under the Maryland Declaration of Rights, which was also not raised below. *See* n. 13, *supra*. The latter issue does not affect our review of one of the properly preserved issues, namely Fourteenth Amendment procedural due process, whereas resolution of the former is dependent on interpreting and applying an entirely separate body of federal law.