*Jason Mercer v. Thomas B. Finan Center*, No. 1398, Sept. Term 2019.  Opinion by Arthur, J.

**STATUTORY INTERPRETATION – RIGHT TO REQUEST ASSISTANCE OF COUNSEL – FORCED MEDICATION OF CONFINED INDIVIDUALS**

Under Md. Code (1982, 2019 Repl. Vol.), § 10-708(i) of the Health-General Article ("HG"), patients involuntarily confined to mental health facilities have the right to request legal or non-legal representation when appealing a clinical review panel's approval of a decision to administer medication against the patient's will.  The patient must affirmatively invoke the right to request representation before the administrative hearing.  In this case, the administrative law judge had discretion to deny the patient's request for representation for lack of good cause because the patient had affirmatively declined his right to request representation before the hearing.

**CONSTITUTIONAL LAW – PROCEDURAL DUE PROCESS – FORCED MEDICATION OF CONFINED INDIVIDUALS**

HG § 10-708(i) provides patients with sufficient procedural due process before the State can administer psychotropic medications by ensuring patients are informed of the right to request representation at administrative hearings.  In this case, the administrative law judge did not deprive the patient of procedural due process by declining to postpone the administrative hearing, because the patient had been informed of his right to request representation and because the State, too, had a significant constitutional interest in ensuring the safety of the patient and of all other patients confined to the mental health facility.

Circuit Court for Allegany County
Case No. C-01-CV-19-000381

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1398

September Term, 2019

_____

JASON MERCER

v.

THOMAS B. FINAN CENTER

_____

Berger,
Arthur,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: January 28, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Appellant Jason Mercer is a patient involuntarily confined to the Thomas B. Finan Center. A clinical review panel decided to administer anti-psychotic medications to him against his will. An administrative law judge (ALJ) approved the decision, and the Circuit Court for Allegany County affirmed the ALJ's order. In this appeal, Mercer claims that he had a statutory right to counsel at the administrative hearing and that the ALJ, in denying his request for counsel, deprived him of his procedural due process rights.

We conclude that Mercer had the statutory right to request the assistance of counsel at the hearing, but that he had declined the assistance of counsel until the hearing began. In these circumstances, we shall hold that the ALJ did not err or abuse her discretion in treating Mercer's belated request for the assistance of counsel as a request for a postponement, for which he lacked good cause. We shall also hold that the ALJ did not deprive Mercer of procedural due process in not conducting an on-the-record colloquy to confirm that he had knowingly and voluntarily waived the right to counsel. Accordingly, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Mercer is a patient at the Thomas B. Finan Center ("the Finan Center"), a psychiatric facility of the Maryland Department of Health. Mercer had been diagnosed with schizoaffective disorder, bipolar type. He was involuntarily placed at the Finan Center after being found not criminally responsible for second-degree assault and unauthorized use of a motor vehicle.

## A. Clinical Review Panel

In July 2019, Mercer began refusing to take his prescribed psychotropic medications. On August 5, 2019, a clinical review panel was convened to determine whether to approve the administration of medication against Mercer's will.[1]

---

[1] In determining whether to approve the recommended medication, the clinical review panel must determine that:

> (1)    The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;
>
> (2)    The administration of medication represents a reasonable exercise of professional judgment; and
>
> (3)    Without the medication, the individual is at substantial risk of continued hospitalization because of:
>
> (i)    Remaining seriously mentally ill with no significant relief of the mental illness symptoms that:
>
>> 1.    Cause the individual to be a danger to the individual or others while in the hospital;
>>
>> 2.    Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
>>
>> 3.    Would cause the individual to be a danger to the individual or others if released from the hospital;
>
> (ii)    Remaining seriously mentally ill for a significantly longer period of time with the mental illness symptoms that:
>
>> 1.    Cause the individual to be a danger to the individual or to others while in the hospital;
>>
>> 2.    Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or

2

The panel found that Mercer had been suffering from increased paranoia because of his refusal to take the medications. Mercer, since refusing medication, had begun to suffer from delusions that led him to refuse food and water. At the time the panel met, Mercer had lost approximately 25 pounds and was continuously dehydrated. He had become distrustful of his own physician and began refusing to engage in therapy sessions. He interfered with other patients' treatment plans and triggered distressed behavior in the other patients by holding his own group therapy sessions and encouraging the other patients to refuse treatment.

The panel determined that, without medication, Mercer was at a greater risk of causing harm to himself or others. Based on these concerns and the recommendations of his treating physician, the panel approved the administration of the recommended medication.

**B. Request for Administrative Hearing and Waiver of Counsel**

On August 5, 2019, the panel gave Mercer written notice of its decision. That same day, Mercer's lay advisor, Lisa Olinger, reviewed both the panel's written decision and the form that the Finan Center uses to inform patients of the right to request an appeal of the panel's decision (the "appeals form") with Mercer.

---

3.      Would cause the individual to be a danger to the individual or others if released from the hospital; or

(iii)    Relapsing into a condition in which the individual is unable to provide for the individual's essential human needs of health or safety.

Md. Code (1982, 2019 Repl. Vol.), § 10-708(g)(1)-(3) of the Health-General Article.

The appeals form informs patients of their procedural rights under Md. Code (1982, 2019 Repl. Vol.), § 10-708 of the Health-General Article ("HG"), when a clinical review panel has approved the administration of medication. The appeals form informs patients, first, of the right to appeal the panel's decision; second, of the requirement that the appeal be filed within 48 hours of receiving the panel's written notice; and, third, of the right to request legal representation. The appeals form also describes the types of legal representation available to patients, including: (1) the right to legal representation provided by the State at no cost to the patient; (2) the right to obtain and pay for the patient's own legal representation; (3) the right to request representation by a non-legal advocate; and (4) the right to decline legal representation and to appear on one's own behalf.

Ms. Olinger discussed the categories of representation with Mercer and explained the process for requesting an appeal. Mercer told Ms. Olinger that he did not want to appeal.

Two days later, on August 7, 2019, Mercer met with Ms. Olinger again. This time he stated that he did want to appeal. Ms. Olinger again went over the appeals form with Mercer. Mercer filled out the form to request an appeal of the panel's decision, but checked the box declining legal representation and told Ms. Olinger that he did not want to be represented by counsel. Ms. Olinger signed and processed the appeals form.[2]

---

[2] On August 13, 2019, while his appeal to the ALJ was pending, Mercer ripped up a floorboard and hid it in his room.

4

### C. Administrative Hearing before the ALJ

Mercer's administrative hearing occurred on August 16, 2019, before an ALJ with the Office of Administrative Hearings. At the start of the administrative hearing, Mercer told the ALJ that he now "desire[d] an attorney." The ALJ, relying on the appeals form, informed Mercer that he had been "offered the opportunity to make a choice" to request legal counsel, but had marked the box declining legal counsel. Mercer stated that he recognized his signature on the appeals form, but told the ALJ that he did not remember signing the form. He also claimed that if he had signed the form, he had not understood it because he did not have "legal counsel available when [he] was filling out" the form.

To confirm whether Mercer had signed the appeals form, the ALJ asked whether Ms. Olinger, who was not present at the hearing, could appear. When Ms. Olinger arrived, the ALJ asked her to confirm that Mercer had signed the appeals form. Ms. Olinger confirmed that Mercer had signed the form. She stated that she had explained to Mercer that if he marked the "no legal representation" box on the form, no attorney would be present at the hearing. Mercer again expressed his desire for an attorney, stating "I really would like to have . . . a lawyer."

The ALJ, based on the appeals form and Ms. Olinger's description of the August 7, 2019, meeting, determined that Mercer "clearly indicated to Ms. Olinger that [he] declined legal representation." The Finan Center agreed, stating that Mercer had declined legal representation. It argued that postponing the administrative hearing to allow Mercer to obtain representation would place both Mercer and the other patients at a continued risk. Mercer again requested a lawyer, stating "I don't understand how all of these

5

procedures work and that's why I'd like to have a lawyer . . . . I can't represent myself because I'm not a lawyer."

The ALJ determined that while "certain procedural safeguards" had been "put into place for these hearings," these safeguards did not require that legal counsel be present while Mercer was reviewing the appeals form. The ALJ also determined that Mercer had declined legal representation after he had been informed of his right to request representation. The ALJ found that Mercer "had a whole lot of time between the time [he] filled out [the appeals form] until now to change [his] mind and ask for counsel." Therefore, the ALJ concluded there was no good cause to postpone the administrative hearing until Mercer could obtain counsel.

The ALJ proceeded to the hearing on the merits and approved the clinical review panel's decision, finding that Mercer did present a danger to himself and others.

### D. Judicial Review of the ALJ's Decision

On August 26, 2019, Mercer petitioned for judicial review of the ALJ's decision in the Circuit Court for Allegany County. The circuit court held the hearing on September 4, 2019. On September 5, 2019, the court issued its decision affirming the ALJ's decision. On October 1, 2019, Mercer filed this appeal.

### QUESTIONS PRESENTED

Mercer presents two questions for appellate review, which we have rephrased for clarity:

I.   Whether the ALJ erred or abused her discretion in treating Mercer's request for the assistance of counsel as a request for a postponement and denying the request for want of good cause.

6

II. Whether the ALJ deprived Mercer of procedural due process by not conducting an on-the-record waiver colloquy to determine whether he had waived his right to request representation.[3]

For the reasons stated below, we conclude that because HG § 10-708 provides patients with a right to request representation that they must affirmatively invoke, and because Mercer affirmatively declined the assistance of counsel until just before the hearing began, the ALJ did not err or abuse her discretion in deciding not to postpone the hearing until counsel could be obtained. We also conclude that due process did not require the ALJ to conduct an on-the-record colloquy to confirm that Mercer had knowingly and voluntarily waived the right to counsel.

**STANDARD OF REVIEW**

We review the decision of the ALJ, not the circuit court. *Allmond v. Department of Health & Mental Hygiene*, 448 Md. 592, 608 (2016); *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. 122, 135 (1995). Our review of the ALJ's decision is

---

[3] Mercer presented the following questions for review in his brief:

1. Did the ALJ commit an error of law by failing to safeguard Appellant's right to counsel?

2. Did the ALJ commit an error of law by failing to ensure due process?

The Department formulated the question as follows:

Did the administrative law judge correctly exercise her discretion when she denied a request to postpone an involuntary medication hearing in order for Mr. Mercer to obtain counsel because Mr. Mercer had declined representation in writing prior to the hearing, he had previously been advised of the availability of pro bono legal assistance, and a postponement would have been dangerous to Mr. Mercer and others in the hospital?

"quite narrow." *Cecil County Dep't of Soc. Servs. v. Russell*, 159 Md. App. 594, 604 (2004). We are limited to determining if there is substantial evidence in the record as a whole to support the findings and conclusions and whether the decision is based on an erroneous conclusion of law. *See*, *e.g.*, *United Parcel Serv., Inc. v. People's Counsel for Baltimore Cnty.*, 336 Md. 569, 577 (1994).

The findings and conclusions are supported by substantial evidence if a reasoning mind reasonably could have reached the factual conclusions that the ALJ reached, "giving deference to the ALJ's prerogative to find the facts and draw reasonable inferences from them." *Motor Vehicle Admin. v. Shea*, 415 Md. 1, 18 (2010). We must affirm the decision if there is sufficient evidence such that a reasoning mind reasonably could have reached the factual conclusion that the ALJ reached. *See Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160 (2005).

"A different, more expansive standard applies to purely legal conclusions[.]" *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 137. Where the decision "'is predicated solely upon an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the [ALJ].'" *Id.* (quoting *Kohli v. LOOC, Inc.*, 103 Md. App. 694, 711 (1995)).

## DISCUSSION

The dispute in this case centers on § 10-708(i)(4)(ii) of the Health-General Article, which provides a patient with the "right to request representation or assistance of a lawyer or other advocate of the individual's choice" when seeking administrative review of a clinical review panel's decision before the ALJ.

In seeking reversal of the ALJ's decision, Mercer first contends that HG § 10-708 creates a statutory right to counsel and that the ALJ was required to conduct an on-the-record colloquy to determine whether he knowingly and voluntarily waived his right to counsel. Although Mercer had declined the assistance of counsel before the hearing began, he argues that the ALJ erred in considering his request for counsel at the hearing itself as a request to postpone the hearing. Mercer also argues that the ALJ deprived him of due process of law by requiring him to proceed without counsel after he attempted to rescind his earlier decision not to request the assistance of counsel.

For the reasons discussed below, we conclude that Mercer's claims lack merit.

**A. Statutory Framework**

Mentally ill patients committed to psychiatric facilities in Maryland have the right to receive "appropriate humane treatment and services in a manner that restricts the individual's personal liberty only to the extent necessary[.]" HG § 10-701(c)(1). This includes the right to refuse the administration of medication. *Id*. § 10-708(b).

A person has a constitutionally protected liberty interest in "'avoiding the unwanted administration of antipsychotic drugs.'" *Allmond v. Department of Health & Mental Hygiene*, 448 Md. at 610 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)); *accord Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 142. To protect the "significant constitutional liberty interest in being free from the arbitrary and capricious administration of such medicines" (*Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 142), HG § 10-708 creates procedural

9

safeguards that the State must follow when seeking to administer medications against a patient's will.

HG § 10-708, as first enacted in 1984, provided only "general guidance" for involuntarily medicating patients in non-emergency situations. *Allmond v. Department of Health & Mental Hygiene*, 448 Md. at 613. In 1990, the Court of Appeals held that HG § 10-708, as it was then structured, failed to afford procedural due process to patients who were being involuntarily medicated. *Willliams v. Wilzack*, 319 Md. 485 (1990).

*Williams* was decided only months after the Supreme Court had held that "[a] State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." *Washington v. Harper*, 494 U.S. at 233. In light of *Washington v. Harper*, the *Williams* Court held that, for HG § 10-708 to afford procedural due process, the statute needed to provide patients with: (1) advance notice of the proceedings before the clinical review panel; (2) the right to be present, to present evidence, and to cross-examine witnesses before the clinical review panel; (3) the right to have assistance from a lay advisor; and (4) the right to obtain judicial review of an adverse panel decision. *Williams v. Wilzack*, 319 Md. at 509-10.

After *Williams v. Wilzack*, the General Assembly, based on the recommendations of a "Mental Hygiene Administration Task Force," proposed amendments to HG § 10-708. The amendments included "enlarged procedural safeguards purportedly . . . to

comport with the due process requirements" that were held lacking in *Williams v. Wilzack*. *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 138.

As amended, HG § 10-708 establishes that before a patient may be involuntarily medicated, a clinical review panel must be convened to approve the administration of the medication. HG § 10-708(f). The patient must be notified that the panel is being convened and informed of the right to attend the meeting of the panel. HG § 10-708(e)(1). Among other things, the patient may "attend the meeting of the panel, excluding the discussion conducted to arrive at a decision"; "present information, including witnesses"; "ask questions of any person presenting information to the panel"; and "request assistance from a lay advisor." HG § 10-708(e)(2).[4] The clinical review panel must base its determination on a "clinical assessment of the information contained in the individual's record and the information presented to the panel." HG § 10-708(h)(1).

If the panel approves the plan to administer medication against the patient's will, the panel must inform both the patient and the patient's lay advisor of its decision, in writing. HG § 10-708(i)(2). The panel's written notice must contain:

(i)     Notice of the right to request a hearing [before an ALJ];

(ii)    The right to request representation or assistance of a lawyer or other advocate of the individual's choice; and

(iii)   The name, address, and telephone number of the designated State protection and advocacy agency and the Lawyer Referral Service.

---

[4] "Lay advisor" is defined as an "individual at a facility, who is knowledgeable about mental health practice and who assists individuals with rights complaints." HG § 10-708(a)(2).

HG § 10-708(i)(4)(i)-(iii).

In addition to the notice that the patient must receive when a panel approves the administration of medication, HG § 10-708 requires the patient's lay advisor to provide certain information. Specifically, the lay advisor must:

(1)     Inform the individual of the individual's right to appeal [to the ALJ] . . . ;

(2)     Ensure that the individual has access to a telephone . . . ;

(3)     If the individual requests a hearing, notify the chief executive officer of the facility or the chief executive officer's designee . . . and give the individual written notice of the date, time, and location of the hearing; and

(4)     Advise the individual of the provision for renewal of an approval under [§ 10-708(n), which generally provides that a panel cannot approve treatment for more than 90 days].

HG § 10-708(k)(1)-(4).

If the patient decides to appeal, the request for an administrative hearing must be filed within 48 hours of the panel's decision. HG § 10-708(*l*)(1). During this 48-hour period, the approval of forced medication is stayed. HG § 10-708(*l*)(3). If the patient requests an administrative hearing, the stay remains "in effect until the issuance of the administrative decision." HG § 10-708(*l*)(3).

Because the administration of medication is stayed pending administrative review, the appeal process is expedited. The ALJ is required to issue a decision within seven days after the clinical review panel's decision. HG § 10-708(*l*)(4). The stay ends when the ALJ issues a decision. HG § 10-708(*l*)(3).

If the patient or the facility decides to appeal the ALJ's decision, the appeal must be filed within 14 days of the ALJ's decision. HG § 10-708(m)(1). The circuit court must hear the appeal and issue a decision within seven days from the date when the appeal was filed. HG § 10-708(m)(4).

**B. The ALJ had discretion to deny Mercer's request to postpone the hearing until he obtained counsel and was not required to conduct a waiver colloquy, because HG § 10-708 does not create a statutory right to counsel.**

Mercer first argues that, based on the "plain meaning" of HG § 10-708, he had a statutory right to counsel, and not merely a right to request counsel. Under his interpretation of the statute, the "right to request representation" could be waived only through an on-the-record colloquy in which the ALJ determined whether Mercer understood the rights being waived.

The goal in interpreting a statute is said to be to "ascertain and effectuate the actual intent of the General Assembly." *Johnson v. Maryland Dep't of Health*, 470 Md. 648, 674 (2020); *Hill v. Motor Vehicle Admin.*, 415 Md. 231, 247 (2010). When the language of a statute is "'clear and unambiguous, our inquiry ordinarily ends there.'" *Hill v. Motor Vehicle Admin.*, 415 Md. at 247 (quoting *Smith v. State*, 399 Md. 565 (2007)).

In full, HG § 10-708(i)(4)(ii) states that patients have "[t]he right to request representation or assistance of a lawyer or other advocate of the individual's choice[.]" The "right to request representation or assistance" unambiguously means that patients

13

*may* request legal representation; it does not mean that the patient has the right to counsel absent a timely request.

Unlike HG § 10-708, other Maryland statutes use unambiguous language to create an unconditional right to counsel. For example, in Child in Need of Assistance (CINA) proceedings, "[a] child who is the subject of a CINA petition shall be represented by counsel[,]" at the State's expense. Md. Code (1974, 2020 Repl. Vol.), § 3-813(d) of the Courts & Judicial Proceedings Article.

Had the General Assembly intended to establish an automatic right to counsel in an administrative appeal of a clinical review panel's decision, it would have said that the patient "shall be represented by counsel," as it did in the CINA statute. The General Assembly would not have placed the burden on the patient to request the assistance of counsel. Nor would it have permitted the patient to select non-lawyers to provide assistance. Therefore, the plain language of HG § 10-708 refutes Mercer's contention that patients have a statutory right to counsel that automatically attaches without any action on their part.

The lay advisor's statutory duties support the conclusion that, under § 10-708, the right to counsel is conditioned upon a request made by the patient. If a panel approves the administration of medication against the patient's will, HG § 10-708(k) requires the lay advisor to inform the patient of the right to appeal and to ensure that the patient has access to the telephone. Because the patient must also be informed of "the right to request representation or assistance of a lawyer or other advocate of the [patient's] choice" and "[t]he name, address, and telephone number of the designated State

14

protection and advocacy agency and the Lawyer Referral Service" (HG § 10-708(i)(4)(ii)-(iii)), it is obvious that the lay advisor's role, in ensuring access to a telephone, is to facilitate the patient's ability to request assistance.

In summary, under HG § 10-708, a patient has the right to request the assistance of counsel (and to request the assistance of a lay advisor, and also to decline the assistance of counsel or a lay advisor). If a patient makes a timely request for the assistance of counsel (or for a lay advisor), the State has agreed to supply counsel (or a lay advisor), at no expense to the patient. Nonetheless, under the plain language of HG § 10-708, patients have the right to the assistance of counsel only if they first request the assistance of counsel.

Here, Mercer was informed of his right to appeal the clinical review panel's decision and of his right to request the assistance of counsel or another advocate at the administrative hearing. Mercer invoked his right to appeal, but he affirmatively declined the assistance of counsel, until he appeared at the hearing. When Mercer belatedly attempted to rescind his decision to decline the assistance of counsel, it was reasonable for the ALJ to interpret his request for counsel as a request for a postponement. In these circumstances, the ALJ did not err in not conducting an on-the-record colloquy to determine whether Mercer had knowingly and voluntarily waived the right to counsel.[5]

---

[5] In arguing that the ALJ's efforts were insufficient, Mercer appears to rely on *In re Alijah Q.*, 195 Md. App. 491 (2010), a case involving an indigent parent's waiver of the statutory right to counsel in a CINA proceeding. *Alijah Q.* does not support Mercer's position. In *Alijah Q.* this Court held that the trial court was *not* required to determine whether a parent had knowingly and voluntarily waived the right to counsel when the parent's attorney informed the court that her client had discharged her. *See id.* at 519; *see*

15

Mercer argues that the legislative history of HG § 10-708, as amended in 1990, shows a legislative intent to create a statutory right to counsel that attaches without any action on his part. Although we conclude that HG § 10-708 is not subject to multiple interpretations (and thus that it is unnecessary to resort to legislative history to ascertain its meaning), we may still review the legislative history to corroborate our interpretation. *See Johnson v. Maryland Dep't of Health*, 470 Md. at 674 ("[w]hether the statutory language is clear or ambiguous, it is useful to review the legislative history of the statute to confirm that interpretation and to eliminate another version of the legislative intent alleged to be latent in the language"); *Martinez v. Ross*, 245 Md. App. 581, 591 (2020) ("[e]ven in instances when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation") (quotation marks omitted), *cert. denied*, 469 Md. 656 (2020). In our view, the legislative history refutes, rather than supports, Mercer's contention.

When HG § 10-708 was amended in response to *Williams v. Wilzack* in 1990, the General Assembly focused on ensuring that the statute created two procedural safeguards: (1) "advance notice to the individual that a clinical review panel will be convened, including the right to attend, present evidence, ask questions, and be assisted by a lay advisor"; and (2) the right to "appeal to the Office of Administrative Hearings if

---

*also id.* at 520 ("a full blown waiver of counsel colloquy is not required with respect to a contested CINA adjudicatory hearing"). Instead, the court was only required to make some attempt to verify that the parent wanted to discharge her counsel. *Id.* at 522. In this case, the ALJ had an ample basis to conclude that Mercer did not even want to be represented by counsel, at least until he announced that he had changed his mind just before the hearing began.

the panel approves the administration of medication." H.B. 588, 1991 Gen. Assembly (Md. 1991).

In amending HG § 10-708, the General Assembly formed a "Mental Hygiene Administrative Task Force" to ensure that the amended bill balanced the "competing interests of mental health consumers, advocates, attorneys, doctors, hospitals, and state officials." Statement of the Maryland Disability Law Center Regarding House Bill 588, Entitled *Refusal of Psychiatric Medication — Administrative Appeal*, 1991 Gen. Assembly (Md. 1991) (statement of Andrew Penn, Attorney, Maryland Disability Law Center).[6] The task force, which included the Maryland Legal Aid Bureau and the Maryland Disability Law Center, agreed that HG § 10-708, as amended, "add[ed] the procedural protections" held lacking in *Williams* and that it alleviated the *Williams* Court's concerns by creating a "streamlined administrative mechanism with built-in timelines for both challenging and maintaining the forced medication order." *Id.*

Neither organization raised any concern that the amended statute did not afford an automatic right to counsel at administrative hearings. Instead, the Maryland Legal Aid Bureau recommended that HG § 10-708(i)(4)(ii) of the amended bill include a right to elect to be represented by an attorney *or* by an "advocate of the individual's choice." Letter from Mary W. Coffay, Managing Attorney, Maryland Legal Aid Bureau to

---

[6] Mr. Penn participated in the work of the Mental Hygiene Administrative Task Force. Previously, he had represented the patient who successfully challenged the former version of HG § 10-708 in *Williams v. Wilzack*.

Delegate John S. Arnick, Chair of the House Judiciary Committee (March 7, 1991).[7]

Thus, the legislative history confirms that HG § 10-708 was intended to give patients the right to request legal or non-legal assistance at an administrative hearing, not to confer a right to counsel that automatically attaches without a request by the patient.

As evidence that the General Assembly intended patients to have a statutory right to counsel in forced medication proceedings, Mercer relies on the creation of the legal assistance program, as part of the consent decree in *Coe v. Hughes*, No. K-83-4248 (D. Md. 1985).[8] The *Coe* consent decree established funding for legal assistance providers "to serve residents who have civil rights or entitlements claims." *Coe* Consent Decree, Civil Action No. K-83-4248 (D. Md. 1984). Mercer claims that the establishment of the legal assistance program led to a statutory right to counsel codified in HG § 10-708.

Mercer's reliance on the legal assistance program is misplaced. The legal assistance program created a procedure for patients confined to mental health institutions to seek legal assistance in *any* civil proceeding, including proceedings regarding "Social Security benefits, Supplemental Security Income, Veterans Administration benefits, Special Education, Vocational Rehabilitation Services, and General Public Assistance." *Coe* Consent Decree at 7. Although the legal assistance program grants patients the right

---

[7] The Legal Aid Bureau represented patients in the guardianship proceedings that the State employed, in the immediate aftermath of *Williams v. Wilzack*, to obtain permission to administer medications against a patient's will. It currently represents patients in hearings before ALJs under HG § 10-708, when the patients request representation.

[8] A copy of the *Coe* consent decree is attached to this opinion.

to seek legal services for civil "entitlement and rights claims," the program did not establish a statutory right to legal assistance unless representation is first requested.

In this case, Mercer had the statutory right to request representation through the Finan Center's legal assistance provider, Maryland Legal Aid. Mercer's lay advisor, Ms. Olinger, informed him of this right, as did the appeals form. Mercer elected to appeal, but declined the assistance of counsel.

Because HG § 10-708 creates a right to request representation, not a statutory right to counsel that attaches without a request, the ALJ's role in the administrative hearing was to determine whether Mercer had previously declined his right to request counsel. The ALJ was not required to determine whether Mercer knowingly and voluntarily waived his right to counsel. The ALJ had substantial evidence to determine that Mercer had previously declined counsel.

The ALJ first considered the documentary evidence—the appeals form—to determine that Mercer had waived his right to request counsel. At the beginning of the administrative hearing, the ALJ reviewed the appeals form with Mercer and confirmed that he had signed the form. The ALJ could have relied on the appeals form alone to determine Mercer had previously declined representation.

As Mercer claimed not to remember signing the form, the ALJ went beyond relying on the appeals form. The ALJ called Ms. Olinger to explain whether Mercer had signed the form. Ms. Olinger confirmed that she discussed the appeals form with Mercer and explained the different options for requesting representation:

We met briefly the day the decision came out. And at that time, he didn't care about an appeal. But then the next – the following day, he did – he asked if an appeal would stop the medication, and I said until you go before a judge and they make a decision. So, he said, okay. Let's do it. So we went over the different categories. And he said, no need for an attorney. So, he did sign the form. I signed the date and time and initialed that and explained there would be no attorney present.

The ALJ was "persuaded by Ms. Olinger's description of her meeting with [Mercer] going through the paperwork not only, one, to explain what an appeal of a Clinical Review Panel would involve but secondly, whether or not you wanted to have counsel." The ALJ found that Mercer had "very clearly indicated to Ms. Olinger that [he] declined legal representation."

Mercer argues that neither HG § 10-708 nor the appeals form set a "prescribed window of time in which the request for counsel must be invoked." He is correct. Nonetheless, the statutory scheme can operate effectively only if a patient makes the request for counsel within a reasonable period of time in advance of the hearing before the ALJ, so that the hearing need not be postponed. In this case, Mercer not only failed to request counsel at any time (let alone at any reasonable time) before the hearing began, but he had affirmatively declined representation.

We need not decide whether Mercer could have rescinded his decision to proceed without counsel at some point earlier than he did. Here, as Mercer waited to request counsel until just before the administrative hearing began, the ALJ could not have fulfilled his request without postponing the hearing.

HG § 10-708(*l*)(5) permits the ALJ to postpone the hearing for "good cause." We review the ALJ's assessment of "good cause" for abuse of discretion. *See State v.*

20

*Frazier*, 298 Md. 422, 450-51 (1984) (stating that a judge "exercises the discretion to postpone a case," the decision "is reviewable only for abuse of discretion," and the determination of good cause for a postponement is "rarely subject to reversal upon review"). Because Mercer had "so clearly identified to Ms. Olinger not only verbally but on this form that [he] decline[d] legal counsel," the ALJ did not abuse her discretion in concluding that he lacked "good cause" to postpone the administrative hearing when he attempted to rescind his previous decision at the outset of the hearing.

> **C.      The ALJ did not deprive Mercer of procedural due process by declining to postpone the administrative hearing until he could obtain counsel.**

Mercer argues that the ALJ, in determining that HG § 10-708 provides patients with the right to request counsel and not the statutory right to counsel, deprived him of procedural due process. He complains that he was unable to adequately represent himself at the administrative hearing because he was not represented by an attorney. For the following reasons, we conclude that HG § 10-708 does provide patients with adequate procedural due process. The ALJ thus had discretion to deny Mercer's request to postpone the hearing until he obtained legal representation.

Under Article 24 of the Maryland Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution, persons cannot be deprived of liberty or property interests without being provided with procedural due process. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause"). The liberty interest in this case

21

is the "significant constitutional interest in avoiding the administration of antipsychotic drugs," as well as the "significant constitutional liberty interest in being free from the arbitrary and capricious administration of such medicines." *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 142 (citing *Riggins v. Nevada*, 504 U.S. 127 (1992); *Washington v. Harper*, 494 U.S. at 221-22).

Patients involuntarily confined to mental health facilities are entitled to due process before the State may infringe upon constitutionally protected liberty interests. Due process, however, "does not require adherence to any particular procedure." *Department of Transportation v. Armacost*, 299 Md. 392, 416 (1984). "On the contrary, due process is flexible and calls only for such procedural protections as the particular situation demands." *Id*.; *accord Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 142; *see Mathews v. Eldridge*, 424 U.S. at 334 ("due process is flexible and calls for such procedural protections as the particular situation demands").

To determine the procedural protections demanded by both the state and federal constitutions, this Court applies the *Mathews v. Eldridge* balancing test. *Johnson v. Maryland Dep't of Health*, 470 Md. 648, 687 (2020). Under the *Mathews* test, we consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335.

Under the first factor of the *Mathews* balancing test, we consider the nature of the private interest that will be affected. Persons have a significant interest "in avoiding the administration of antipsychotic drugs." *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 142. "Nevertheless," the "constitutional interests retained by involuntarily committed individuals 'must yield to the legitimate government interests that are incidental to the basis for the legal institutionalization, and are only afforded protection against arbitrary and capricious government action.'" *Id.* at 143 (quoting *United States v. Charters*, 863 F.2d 302, 305 (4th Cir. 1988)). Mercer "was involuntarily retained at the Finan Center because [he] needed mental health treatment." *Id.* "Thus, the governmental interest in providing [Mercer] with the mental health care that [he] required must also be considered alongside [his] interest in being free from arbitrary and capricious government action." *Id.*

The second factor of *Mathews* looks "at the risk of an erroneous deprivation of [Mercer's] constitutional interests through the existing procedures" while considering the "probable value, if any, that the procedures proposed by [Mercer] would have in minimizing the risk of an erroneous deprivation of [his] rights." *Id.* at 144, 147. Mercer contends that the ALJ's failure to conduct an on-the-record waiver colloquy led to an erroneous deprivation of his interests and an "unfair hearing where . . . [he] [was] left without resources to defend against an incredible violation of personal liberty." Mercer, however, did not have a due process right to counsel (as opposed to a lay advisor) at the hearing before the ALJ. *See Washington v. Harper*, 494 U.S. at 236. Thus, the question in this case is whether due process requires the ALJ to conduct an on-the-record colloquy

23

as an additional safeguard to ensure that a patient has knowingly and voluntarily declined to exercise the statutory right to request counsel. [9]

Under Mercer's formulation, the ALJ could not rely on the form by which the patient declined to request the assistance of counsel or on the lay advisor's unsworn representations that she had advised the patient of the right to request counsel and that the patient had declined. Instead, the ALJ apparently would be required to conduct an on-the-record colloquy whenever a patient has declined to exercise the statutory right. Mercer's contention is in some tension with this Court's previous decision that an ALJ need not inquire into whether a patient has the "mental capacity to understand and exercise the right of appeal" when the patient fails to file a timely appeal of a clinical review panel's decision. *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 128.

---

[9] Mercer cites Justice White's plurality opinion in *Vitek v. Jones*, 445 U.S. 480, 496-97 (1980), for the proposition that "[a] prisoner thought to be suffering from a mental disease or defect requiring involuntary treatment probably has an even greater need for legal assistance [than prisoners who are illiterate and uneducated], for such a prisoner is more likely to be unable to understand or exercise his rights." In *Vitek* the Court held that before a State may transfer a prisoner to a mental hospital, it must provide timely written notice, a hearing at which the prisoner may present testimony and cross-examine witnesses, an independent decisionmaker, and written findings and conclusions by the decisionmaker. *Id*. at 494-96. Justice Powell, the fifth member of the five-member majority, did not join the plurality's statement regarding the right to counsel. *Id*. at 500 (Powell, J., concurring). He opined that due process would be satisfied if the State provided "a qualified and independent adviser who is not a lawyer." *Id*. at 499 (Powell, J., concurring). In *Washington v. Harper*, 494 U.S. at 236, the Court endorsed Justice Powell's view and held that "the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection."

Under the final *Mathews* factor, we consider the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. at 335. The State has a substantial interest in ensuring a patient's health and safety and in ensuring that patients are provided with the mental health care they require. *Beeman v. Department of Health & Mental Hygiene*, 107 Md. App. at 143. In addition to providing treatment to the patient, the State has a significant obligation in ensuring the health and safety of other patients at the facility, as well as staff members. *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (holding that "[t]he State also has the unquestioned duty to provide reasonable safety for all residents and personnel within a [state mental health] institution").

Mercer argues that the State would not be burdened by requiring the ALJ to conduct a waiver colloquy because the expedited procedures of HG § 10-708 would make any postponement "brief." Mercer also argues that even if a brief postponement posed a risk, the facilities have other means of securing the safety of all patients, such as the ability to medicate patients in emergency circumstances.[10]

In our judgment, the expedited procedures of HG § 10-708 are important in facilitating the State's ability to protect the health and safety of patients and others. If a patient appeals the clinical review panel's approval of forced medication, the approval is

---

[10] "Medication may not be administered to an individual who refuses the medication except: (1) [i]n an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others[.]" HG § 10-708(b)(1).

25

stayed until the ALJ's decision. Any additional postponement poses significant risks to both the patient and to others, including other patients and staff members.

The additional burden of a postponement is evident here. Mercer had already lost 25 pounds, or eight pounds every ten days, while refusing his prescribed medication. During that same time, the facility had been forced to close the common areas at the Finan Center because Mercer had been "triggering other patients." While his appeal to the ALJ was pending, Mercer had ripped up a floorboard and hidden it in his room. The State's interest in ensuring that he and others are safe and that he and other patients are properly treated could be significantly burdened if the ALJ were required to conduct a waiver colloquy under the circumstances of this case.

Based on the *Mathews* balancing test, we conclude that the ALJ did not deprive Mercer of procedural due process in declining to postpone the hearing. Mercer was informed of his right to request representation and of the consequences of representing himself at the hearing. The ALJ confirmed, by reviewing the appeals form and by conferring with Ms. Olinger, that Mercer had previously declined to exercise his right to counsel. Therefore, the ALJ appropriately considered Mercer's request for counsel as a request to postpone the administrative hearing and had substantial evidence to deny this request.

For these reasons, we affirm the ALJ's decision approving the clinical review panel's decision to medicate Mercer.

> **JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED; APPELLANT TO BEAR ALL COSTS.**

## APPENDIX



COE, et al,

      Plaintiffs

      v.

HARRY R. HUGHES, in his official
capacity as Governor of the
State of Maryland;
TREVOR R. HADLEY, in his
official capacity as
Assistant Secretary for Mental
Retardation, Addictions and
Developmental Disabilities; and
ALP KARAHASAN, in his official
capacity as Director of the
Mental Hygiene Administration.

      Defendants

CIVIL ACTION NO. K-83-4248

### CONSENT DECREE

IT IS HEREBY STIPULATED by and between the undersigned attorneys for Plaintiffs and the undersigned attorneys for Defendants Hughes, Hadley and Karahasan, on behalf of their respective parties:

1. On December 12, 1983, Plaintiffs, residents in Mental Hygiene Administration ("MHA") inpatient facilities, filed suit in the above-captioned action seeking declaratory and injunctive relief.

2. Prior to the court's consideration or adjudication of any of the issues of fact or law raised in this case, these Defendants have voluntarily determined that they will implement the Legal Assistance Program described below for residents of MHA

inpatient facilities described below.

3. The purpose of this Legal Assistance Program is to assure that residents have effective access to the system of justice by:

    a.   Providing residents of MHA inpatient facilities with a system of rights advisors and independent attorneys so that the rights of residents will be enforced;

    b.   Helping residents of these facilities enforce claims to benefits and entitlements (like Social Security, supplemental security income and Veterans Administration benefits) that provide a source of funds, often federal funds, to enable qualified residents to receive community mental health services that are essential to careful deinstitutionalization; and

    c.   Establishing a system of recruiting attorneys, including volunteer private attorneys, to help residents resolve other basic civil legal problems, including legal problems that interfere with, and obstruct effective treatment.

-2-

31

## I. Definitions

For the purposes of this Consent Decree, the following terms have the meanings indicated:

1. "Indigent" means having a level of income that makes an individual eligible for the services of the Maryland Public Defender.

2. "Legal Assistance" means civil legal help in its broadest forms, e.g.: legal interviews, legal advice, counselling and negotiation, legal representation in administrative and judicial proceedings, etc.

3. "Mental Hygiene Administration inpatient facility" means the following facilities: Clifton T. Perkins, Crownsville, Eastern Shore, Springfield, Spring Grove, the three Regional Institutes for Children and Adolescents, Highland Health Psychiatric Unit, the Walter P. Carter Center inpatient facilities (both in Baltimore and in Catonsville, Maryland), the Thomas Finan Center, and the Upper Shore Community Mental Health Center.

4. "Mental Hygiene Administration Staff" means officials, agents and employees of the Mental Hygiene Administration, including officials and employees of the Mental Hygiene Administration inpatient facilities.

5. "Provider" means the entity or entities that will provide the legal services set forth in Section III below, to residents in Mental Hygiene Administration inpatient facilities. The term "Provider" shall include not only the entity that directly contracts with the MHA to provide legal

-3-

32

assistance to residents, but also all entities that, as a result of sub-contracts with the Contractor Provider, provide legal assistance to residents. Where distinctions between "Provider" are necessary herein, the direct contractor with the MHA shall be called the "Contractor Provider", and entities providing legal assistance pursuant to subcontracts shall be called "Subcontractor Provider".

6. "Resident" means any indigent person who resides, whether as a result of a voluntary admission or involuntary commitment, in a Mental Hygiene Administration inpatient facility.

## II. Parties Bound By This Consent Decree

The parties bound by this Consent Decree include the named Plaintiffs and the class they represent[1] and the named Defendants[2] in their official capacities, and their successors, and their agents and employees. The Plaintiffs reserve the right to add additional defendants to this case if necessary to fully implement this Consent Decree. The Defendants reserve the right to oppose the addition of defendants to this case.

---

[1] On May 4, 1984, the Court approved a Consent Order Certifying Class Action that defined the class as "all indigent persons residing in public mental health facilities operated by the Maryland Mental Hygiene Administration, with sub-classes consisting of: 1. All persons voluntarily admitted to such facilities; and 2. All persons involuntarily committed to such facilities."

[2] The Honorable Harry Hughes, acting in his official capacity as Governor of Maryland is substituted for the State of Maryland. Trevor R. Hadley, Ph.D., current Assistant Secretary for Mental Health, Mental Retardations, Addictions and Developmental Disabilities is substituted for his predecessor, Defendant Stanley R. Platman, M.D.

-4-

33

III. Legal Assistance Program

      1.  Defendants agree to develop and maintain a Legal Assistance Program that is an adequate means for assuring that residents have effective access to the system of justice. Indeed, defendants have already begun developing this Program. This Program shall have two parts:

      a.  A Resident Grievance System ("RGS") that provides a fair, efficient and accessible administrative mechanism for receiving and resolving resident complaints in a timely manner;

      b.  A legal assistance Provider that supplies attorneys and other legal staff, who shall be independent of the MHA, to serve residents who have civil rights or entitlements claims (see paragraph 3 of this Section).

      2.  The purpose of the RGS is to provide "rights advisors" to residents. These rights advisors will serve as advocates to assist residents in resolving civil rights complaints and other complaints that involve potential harm to clients. As part of their advocacy on behalf of residents, the rights advisors will investigate and mediate complaints, and will represent residents before MHA committees, boards, and tribunals. The rights advisors will be located in the MHA inpatient facilities and will report to the Office of the Assistant Secretary for Mental Health, Mental Retardation,

-5-

34

Addictions and Developmental Disabilities. The RGS will be tested within two MHA inpatient facilities for a six month trial implementation period. At the end of that period, the RGS will be reviewed, revised and then proposed as a regulation. The target date for the implementation of that final regulation is January 1, 1986. Defendants shall provide Plaintiffs' counsel with copies of the proposed RGS to be tested, written evaluations of its trial implementation, and the proposed final regulation. Plaintiffs' counsel shall also be given ongoing and effective access to the RGS, as it operates in both its proposed and final form, and to RGS records, for the purposes of conducting evaluations of the RGS and making suggestions to the defendants about its design and operation. A draft of the RGS as currently proposed is attached as Appendix 1 and incorporated herein by reference. The final regulation, which shall be promulgated and adopted pursuant to State law, shall be substituted for that draft and, at that time, incorporated in this Consent Decree by reference. Any subsequent amendments to the final regulation shall be similarly adopted and incorporated herein.

3. The legal assistance Provider shall provide legal assistance to residents who have the following civil legal problems:

      A.   Entitlement claims: that is, claims to benefits or entitlements that are set forth in federal or state constitutions, statutes, and administrative regulations or policies, and common law (e.g. Social Security benefits, Supplemental Security

-6-

35

Income, Veterans Administration benefits, Special Education, Vocational Rehabilitation services, and General Public Assistance, etc.); and

B. Rights claims: that is, claims to rights guaranteed by federal and state constitutions, statutes, administrative regulations or policies and common law.


4. The Contractor Provider shall also arrange for general legal problems, including, but not limited to, domestic law problems, wills, etc. to be handled by the Legal Aid Bureau, the Maryland Volunteer Lawyer Service, Inc., or by other attorneys or legally trained persons. No funds received by the Provider from Defendants (see for example the contract referred to in Paragraph 8 of this Section) shall be used for these general legal problems. When applying for funding to become the "Legal Assistance Contractor Provider", the applicant must demonstrate how and to what extent these services will be so provided.

5. In addition to providing direct legal assistance to residents, Provider staff will provide training to the "rights advisors" of the Resident Grievance System and to MHA inpatient facility staff if reasonably requested to do so.

6. The Provider will employ lawyers, paralegals, law students, lay advocates, and other persons with appropriate professional expertise, all of whom shall be qualified by training, personal commitment, and work experience to provide

-7-

36

7

quality legal assistance to residents.

7. Provider staff shall attempt to resolve legal problems between residents and MHA staff by negotiation and conciliation whenever reasonably possible. Although Provider staff and their clients ultimately shall decide whether or not to invoke the RGS, it is the intent of the parties herein that the RGS be invoked to resolve legal problems where it provides a fair, efficient and complete remedy for these problems. To encourage informal resolution of disputes, Provider staff will be available to MHA staff who wish to discuss and resolve resident problems. In turn, MHA staff, as well as the committees, panels and boards that are available to resolve resident disputes, (hereafter "committees"), will also be available to Provider staff. Provider staff shall be entitled to make presentations to such committees on behalf of Provider clients. Such committees shall include, but not be limited to medication review panels, the committees that will implement the RGS, and, where appropriate, individual treatment teams.

8. The Maryland Disability Law Center ("MDLC") shall be the Contractor Provider from July 1, 1985 to June 30, 1988. The MDLC shall receive $500,000 a year plus reasonable annual salary adjustments, pursuant to a three year cost-reimbursement contract. The contract shall begin July 1, 1985 and end June 30, 1988. At the end of that period, the Provider shall thereafter be funded by MHA through a contract entered into pursuant to the applicable law of Maryland at a level that is adequate to assure that residents with entitlements and rights claims receive legal

-8-

37

assistance and that, in any event, is equal to the previous year's contractual sum, plus a reasonable salary adjustment.

9. To implement its contract with the MHA, the Provider may subcontract with any other person or agency, including the Legal Aid Bureau, Inc., although the Contractor Provider shall be ultimately responsible for the performance of its contractual duties. The MDLC has indicated its intention, when it becomes the initial Contractor Provider, to enter into a subcontract with the Legal Aid Bureau, Inc.

10. The MDLC has already been given $30,000 for the period from November 1, 1984 to June 30, 1985 to help provide legal assistance to residents while the Legal Assistance Program is being fully developed. An additional sum of money, in an amount adequate to begin incremental, but reasonable implementation of the Provider program prior to July 1, 1985, shall be given by the MHA to the MDLC.

11. The design, establishment and administration of the legal assistance Provider shall insure the independence of Provider staff that is mandated by the Code of Professional Responsibility, now Appendix F to the Maryland Rules. The professional judgment of Provider staff shall be exercised solely for the benefit of Provider clients, and the desires of any other person shall be disregarded when they either would conflict with the interests of the client or otherwise impair the independent judgment of Provider staff.

-9-

38

9

IV. Evaluation of the Legal Assistance Program

1. The Legal Assistance Program shall be regularly monitored and evaluated by a Board of Review. That Board of Review shall consist of seven persons. These persons shall be jointly appointed by counsel for Plaintiffs and Defendant Hadley. Four shall be attorneys and three shall be chosen from lists of nominees submitted by On Our Own, Inc., the Maryland Association of Psychosocial Centers, Inc.; the Maryland Mental Health Association; and the Alliance for the Mentally Ill of Maryland, Inc.

2. The term of each board member will be for three years except that three of the members first appointed shall serve for a term of one year and three shall serve for a term of two years. Each member shall continue to serve until a successor has been appointed. Any vacancy shall be filled by a majority vote of the remaining members. A Board member shall not be reappointed for more than two consecutive terms immediately following the member's initial term.

3. Board members shall serve without compensation.

4. The Board shall meet as needed to discharge the below listed duties, but in no event any less frequently than four times a year. The duties of the Board are:

    a. Evaluate and monitor the development and administration of the Legal Assistance Program (both the RGS and the Legal Assistance Provider) to assure that it provides quality

-10-

39

assistance to MHA inpatient facility residents.

    b.    Issue, for three years after the approval of this Consent Decree, quarterly reports to the parties and the Court in this case indicating the extent to which the Legal Assistance Program is implementing the instant Consent Decree and identifying obstacles, if any, to full implementation.

    c.    Make timely recommendations to the parties, to be filed with the Court, in the instant case with respect to the design and operation of all phases of the Legal Assistance Program.

## V. Access to MHA Residents and Records

1. Provider staff shall be provided with access to an interview room in each MHA facility. That room will be equipped with a telephone and essential furniture. The room will provide privacy to insure confidentiality.

2. Provider staff shall be allowed access to all MHA inpatient facility wards during all reasonable hours for the purposes of interviewing MHA facility residents to determine whether they have civil legal problems and interviewing, advising, and representing Provider clients who do have civil legal problems and wish legal assistance.

3. Provider staff shall be given access to residents' records with either written consent of those residents or

-11-

40

11

pursuant to $10-701(e) of the Health-General Article.

4. Residents shall be able to place telephone calls to, and correspond with Provider offices at all reasonable times. To fully implement this provision, the MHA inpatient facility shall provide indigent residents with both a reasonable number of free and confidential attorney phone calls per week and the writing instruments, stationery, and postage necessary to send free, confidential, and sealed correspondence to the Provider on a regular basis.

5. The telephone numbers and addresses of Provider staff, along with a simple description of the functions of the Provider, shall be posted prominently in all facility wards.

## VI. Other Stipulations

1. The terms and conditions of the Consent Decree shall not be construed or interpreted as an admission by, or a finding that the State of Maryland or any of its offices, departments, employees, boards or commissions have violated any provisions of the laws or Constitutions of the United States or the State of Maryland.

2. At least every three months for three years after the approval of this Consent Decree, Defendants shall file reports with counsel for Plaintiffs, the Court, and the Board of Review describing the steps taken by them to comply with this Consent Decree. Counsel for Plaintiffs and the Court shall also be provided with the quarterly reports made by the Legal Assistance Program's Board of Review.

-12-

41

12

3. The parties agree that this Consent Decree is a final judgment in the above-captioned case.

4. Defendants reserve the right to reduce the funding and staff of the Legal Assistance Program in proportion to any decrease in the resident population of Mental Hygiene Administration inpatient facilities. Before such pro rata reductions are made, the MHA and Contractor Provider shall consider and discuss whether the proposed reductions should be used to provide legal assistance, in the nature of legal aftercare, to released patients.

5. The parties agree that the Court shall retain jurisdiction over the instant case until the terms of the instant Consent Decree are fully implemented for the purposes of assuring implementation and allowing any party to apply at any time for an order seeking interpretation, implementation, enforcement, or modification of this Decree. In this respect, the parties specifically reserve the right to seek modification of the Consent Decree if, based upon objective evaluations conducted by the Board of Review of the operation of the Legal Assistance Program during its first three years of operation, the moving party can demonstrate clearly that: 1) the specific level of Provider funding set forth in the Consent Decree is either inadequate or more than necessary to implement fully the Consent Decree; or 2) the level of funding in fact provided by the MHA to implement the RGS is either inadequate or more than necessary to implement fully the Consent Decree. The parties also reserve the right to amend the Consent Decree by agreement subject to Court

-13-

42

13

approval.

DEFENDANTS:

_____
HARRY R. HUGHES
Governor

_____
TREVOR R. HADLEY, PH.D.
Assistant Secretary for Mental Health,
Mental Retardation, Addictions and
Developmental Disabilities

_____
ALP KARAHASAN, M.D.,Ph.D., Director
Mental Hygiene Administration

ATTORNEYS FOR DEFENDANTS:

_____
STEPHEN H. SACHS
Attorney General

_____
DENNIS M. SWEENEY
Deputy Attorney General

_____
ELLEN A. CALLEGARY
Special Assistant
   to the Attorney General

_____
VARDA N. FINK
Deputy Counsel

_____
SUSAN SUGAR NATHAN
Assistant Attorney General
Office of the Attorney General
7 North Calvert Street
Baltimore, Maryland 21202

ATTORNEYS FOR PLAINTIFFS:

_____
MICHAEL A. MILLEMANN
510 West Baltimore Street
Baltimore, Maryland 21201

_____
NORMAN ROSENBERG

_____
LEONARD RUBINSTEIN

_____
ARLENE KANTER
Mental Health Law Project
2021 L Street, N.W.
Washington, D.C. 20036

-14-

43

14